IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MICHAEL DARNELL OLIVER,          *
(AIS #: 207467)                  *
    Plaintiff,             *
                                 *
vs.                              *     CIVIL ACTION NO.11-00520-KD-B
                                 *
JOHNNY L. JOHNSON, *et al.*,     *
                                 *
    Defendants.            *

## REPORT AND RECOMMENDATION

Michael Darnell Oliver, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on Defendants' Motion for Summary Judgment (Doc. 73)[1] and Plaintiff's Response thereto (Doc. 74). Upon consideration of the foregoing pleadings, and all other relevant pleadings in this file, the undersigned recommends that Defendants' motion be **GRANTED**, in part, and be **DENIED**, in part, and that the remaining issue be set for an evidentiary hearing. Specifically, Defendants' motion is due to be GRANTED and Plaintiff's claims arising out of the incident occurring on July 10, 2011 and involving Defendants Shelton Forney, L. Bailey, K.

---

[1] Defendants' Answers and Special Reports (Docs. 48, 49, 53, 59 70, and 72) were collectively converted into and treated as a motion for summary judgment.

Reynolds, R. Armstrong, Johnny L. Johnson, C. Kimbrel, and Thaddeus Betts should be dismissed. Likewise, Defendant's motion is due to be GRANTED, and Plaintiff's claims arising out of the incidents occurring on August 24-25, 2011, and involving Defendants Johnny L. Johnson, C. Kimbrel, J. Broadhead, Earnest Stanton, A. Gipson, C. Daughtry, Russell Johnson, and Carroll are due to be dismissed. Defendants' motion is due to be DENIED however to the extent Defendants seek the dismissal of Plaintiff's excessive force claims arising out of the incident occurring on November 12, 2011 and involving Defendants Kimbrel, Tyus, Andrews, Broadhead, Stanton and Gipson.

## I.  BACKGROUND

### a. JULY 10, 2011

Plaintiff filed this action on July 18, 2011 (Doc. 1 at 4), in the Middle District of Alabama. After the case was transferred to this district, Oliver filed several amended complaints, the last complaint, which is the operative one, was filed on August 21, 2012, pursuant to § 1983 action. (Doc. 28). In his complaint, Oliver alleges that while incarcerated at Holman Correctional Facility ("Holman"), he was physically assaulted by prison officials on three separate occasions, namely July 10, 2011, August 24, 2011 and November 12, 2011. (Doc. 28 at 5 – 11).

With respect to the July 10, 2011 incident, Oliver alleges that at approximately 12:15 a.m., while in the segregation unit at Holman, Defendant Sergeant C. Kimbrel, (hereafter "Kimbrel") handcuffed him though the tray slot area of his cell to escort Oliver for a haircut. (Id., at 10). Kimbrel went into Oliver's cell and threw away Oliver's "Victory Magazine and a drawing". (Id.). Oliver contends that he complained about Kimbrel's action to Defendant Sergeant Johnny Johnson (hereinafter "J. Johnson") and as Oliver sat into the chair for his haircut, J. Johnson began "hollering words of profanity" at him, punching him in face, and choking him numerous times. (Id.). Then, a "Code Red" was called and Defendants Kimbrel, Correctional Officer Reynolds (hereafter "Reynolds"), C.O. Thaddeus Betts (hereafter "Betts"), C.O. Shelton Forney (hereafter "Forney"), Sergeant L. Bailey (hereafter "Bailey"), and C.O. R. Armstrong (hereafter "Armstrong") came to assist. (Id.). Oliver contends that Kimbrel and Betts begin spraying his face with Sabre Red mace several times, until he began choking. (Id.). At this point, all of the guards began repeatedly punching and kicking Oliver until his chair flipped over. (Id.). Next, the guards started stomping, kicking, and punching him in all areas of his body. (Id.). Oliver contends that he pleaded with the guards for his

asthma inhaler and begged them not to reinjure his right arm, which had been broken several months earlier in an unrelated fight at another prison facility. (Id., at 11). Oliver asserts that despite his requests, the assault continued as the officers picked him up and "rammed" his head into the walls several times. (Id.).

According to Oliver, Defendants Bailey and Armstrong "snatched [his] shower shoes" and his pants off and stated "you got a pretty booty" in agreement with one another. (Id.). Oliver asserts that when they arrived at the medical ward, Betts and Kimbrel took turns choking him until he began hyperventilating and fainting and ultimately, suffered an asthma attack. (Id., at 11-12). The officers then began shouting "die you fucking Mason – die you fucking Mobster, die you fucking B.G.D.N.!" (Id., at 12) (emphasis in original). The nurse then provided Oliver with a "brand new inhaler" and gave him "two puffs". (Id.). Oliver asserts that cold water was run over his head and that a "chronic care visit and sick call" were conducted, which reflect that he suffered "lumps, bruises, swollen eyes, and cuts all over [his] body!" (Id.).

### b. **AUGUST 24-25, 2011**

With respect to the August 24-24, 2011 incidents, Oliver alleges that on August 24, 2011, he and Defendant Carroll, who

was standing outside of Oliver's segregation cell, engaged in a verbal dispute, and that Carroll left the cell cursing and saying that he was going to "whip [Oliver's] ass", and Oliver responded, "[n]ot by yourself you won't – chump!" (Id.). Oliver asserts that Carroll returned to Oliver's cell accompanied by Defendants J. Johnson, Russell Johnson (hereafter "R. Johnson"), C. Daughtry (hereafter "Daughtry"), Earnest Stanton (hereafter "Stanton"), Kimbrel, Anthony Gipson (hereafter "Gipson"), and J. Broadhead (hereafter "Broadhead"), and that J. Johnson opened Oliver's tray slot and told the other guards to assist him in spraying Oliver with Sabre Red mace. (Id.). After six (6) bursts of the chemical were sprayed, Oliver began struggling to breathe and pleading with the officers to stop because he feared suffering an asthma attack. (Id., at 8-9). The officers administered three (3) more bursts of the chemical. J. Johnson then handcuffed Oliver as he was gasping for air. (Id., at 9).

According to Oliver, at that point, all of the officers began punching him repeatedly in the face, neck, and back. (Id.). Oliver contends that the guards "ramm[ed]" his head into the side panel of the doorway and repeatedly punched him in different parts of his body. (Id.). Oliver was then pushed down on the bed and his pants were snatched off. (Id.). Defendant Daughtry told Oliver to "suck his penis" and stated, "I bet you

5

don't feel like a man now". (Id.). Oliver responded, "go tell yo' daddy sissyboy!" (Id.). The guards continued punching and stomping Oliver. (Id.). According to Oliver, the nurse rushed him his inhaler, and his asthma worsened after this incident. (Id.).

Oliver further contends that later the same night, on August 25, 2011, his cell was "stripped down" and "fecal water" was left on the floor. (Id.). Oliver contends that he was left in his cell for three (3) weeks with no "running water" and "flies and maggots [were] crawling in the fecal water that was on the floor". (Id.).

### c. NOVEMBER 11, 2011

With respect to the November 11, 2011 incident, Oliver alleges that at approximately 3:00 a.m., Defendant Broadhead, who was accompanied by Defendants Stanton and Gipson, placed handcuffs on him for a cell search. (Id., at 3). Oliver contends that as he was standing outside of the cell, Stanton grabbed him by the back of his head and began repeatedly banging the front of his head against the outside wall. (Id.). Defendants Kimbrel, Sergeant K. Tyus, and Andrews joined the other three officials. (Id., at 7). The guards pushed Oliver onto a bed and snatched off his pants and boxers. (Id.). The men began choking and punching Oliver repeatedly while his hands

were still in handcuffs behind his back. (Id.). Oliver informed the men that he had asthma and was having trouble breathing and the men refused to stop the beating. (Id.). The guards then transported Oliver to the medical ward and continued to punch and kick him while on the elevator. (Id.). Oliver received "two puffs" for his asthma attack and "a brand new inhaler!" (Id., at 7-8). According to Oliver, the next day, Nurse Debra Poindexter conducted a follow-up sick call and chronic care visit and documented the "damages done by the" prison guards, which included two black eyes, cuts, bruises, swelling, and a fractured right ribcage. (Id., at 8).

### d. PROCEEDINGS

In his complaint, Oliver names as Defendants: J. Johnson, Kimbrel, Betts, Tyus, Andrews, J. Broadhead, Stanton, Gipson, Daughtry, Carroll, Reynolds, R. Johnson, S. Forney, Armstrong, and Bailey and asserts claims of excessive force, deliberate indifference, negligence, wantonness, reckless endangerment, sexual harassment, and inhumane conditions. (Doc. 28, 4-5, 13-17)[2].

---

[2] Oliver seeks damages in the amount of $2.3 million for each of the three incidents alleged in the complaint as well as a permanent restraining order which would require Defendants to

In their Answers and Special Report filed on April 18, 2013, January 21, 2014, and January 31, 2014, Defendants deny Oliver's allegations to the extent that he claims his rights were violated and that he was assaulted, and they assert the defenses of absolute and qualified immunity[3], failure to state a

---

remain at least 100 yards from him for at least three (3) years, and a "triple black with sparkle-change color in day-then at night paint job: Rolls-Royce Ghost year 2013 fully paid w/ insurance paid for up to (3) three months worth." (Doc. 28 at 6). Plaintiff also seeks nominal damages because Defendants' conduct allegedly caused his asthma condition to become more serious. (Id.). Finally, Plaintiff seeks court costs, attorney's fees, and transportation for his witnesses, inmates James Maples and John E. White and Nurse Debra Poindexter. (Id.).

[3] It is unclear from the Complaint whether Plaintiff is suing Defendants in their official capacities, individual capacities, or both. Thus, the Court will consider both. As state officials, Defendants are absolutely immune from suit for damages in their official capacities, see Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998) (state officials sued in their official capacities are protected from suit for damages under the Eleventh Amendment). Defendants are not immune, however, from suit in their official capacities for prospective injunctive relief to end continuing violations of federal law. See Ex parte Young, 209 U.S. 123, 155-56 (1908); see also Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1336 (11th Cir. 1999).

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). The Eleventh Circuit has made clear that the

claim, failure to exhaust administrative remedies, contributory negligence, self-defense, estoppel, preclusion of claims by the Prison Litigation Reform Act, no actionable injury, unclean hands doctrine, and assumption of risk by Plaintiff's assault on officers. (Docs. 48, 49, 58, 70, 72). In support of their defenses, Defendants have submitted their affidavits, investigative and disciplinary reports concerning the incidents, and Oliver's relevant medical records. (Docs. 48-1 – 48-14, 70, 72).

On February 4, 2014, the Court ordered that Defendants' Special Report and Answers be converted into a Motion for Summary Judgment, and afforded the parties an opportunity to submit a response in support of or opposition to the motion. (Doc. 73). On February 25, 2014, Oliver submitted a document entitled "Affidavits and Answer/Response" wherein he included a personal affidavit, an affidavit from inmate James Maples and an affidavit from inmate Ricky Gilland. (Doc. 74 at 1-17). The motion and response are now before the Court on review.

---

defense of qualified immunity "is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'macliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court decisions in Hudson and Whitley." Skritich v. Thorton, 280 F.3d 1295, 1301 (llth Cir. 2002)(citation omitted).

## II.  **SUMMARY JUDGMENT STANDARD**

Summary Judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Garczynski v. Bradshaw, 573 F.3d 1158, 1165 ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no *genuine* issue of *material* fact.")

> The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id., at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id., at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there

> is a genuine issue for trial.'" Id., at 324.
> To avoid summary judgment, the nonmoving
> party "must do more than show that there is
> some metaphysical doubt as to the material
> facts." Matsushita Elec. Indus. Co. v.
> Zenith Radio Corp., 475 U.S. 574, 586, 106
> S. Ct. 1348, 89 L. Ed. 2d 538 (1986). On
> the other hand, the evidence of the
> nonmovant must be believed and all
> justifiable inferences must be drawn in its
> favor. See Anderson, 477 U.S. at 255.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 2013 U.S.

Dist. LEXIS 28034, *5-7, 2013 WL 765314 (S.D. Ala. Jan. 29,

2013) (citations omitted).

In considering whether the Defendants in this case are

entitled to summary judgment, the Court has viewed the material

facts in the light most favorable to Oliver where there are

genuine disputes. Comer v. City of Palm Bay, Florida, 265 F.3d

1186, 1192 (11th Cir. 2001) ("We view the evidence and all

factual inferences raised by it in the light most favorable to

the non-moving party, and resolve all reasonable doubts about

the facts in favor of the non-moving party."). The requirement

to view the facts in the nonmoving party's favor extends only to

"genuine" disputes over material facts. A genuine dispute

requires more than "some metphysical doubt as to material facts."

A "mere scintilla" of evidence is insufficient; the nonmoving

party must produce substantial evidence in order to defeat a

motion for summary judgment. Garczynski, supra, 573 F.3d at 1165

11

(internal citations omitted). In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); see also Logan v. Smith, 439 Fed. App'x 798, 800 (11th Cir. Aug. 29, 2011) ("In cases where opposing parties tell different versions of the same events one of which is blatantly contradicted by the record- - -such that no reasonable jury could believe it- -a court should not adopted the contradicted allegations." (citations omitted)).[4]

### III. DISCUSSION

In this action, Oliver seeks redress pursuant to 42 U.S.C. § 1983 for alleged constitutional deprivations arising out of altercations between himself and several staff members at the

---

[4] "Unpublished opinions are not considered binding precedent, but may be cited as persuasive authority." 11th Cir. R. 36-2.

Holman facility on July 10, August 24-25, and November 12, 2011.
The Court addresses each incident in turn.

### a. JULY 10TH INCIDENT

As best the Court can discern, with respect to the July 10
incident, Oliver alleges that Defendants J. Johnson, Broadhead,
Kimbrel, Betts, Forney, Bailey, Reynolds and Armstrong used
excessive force against him.

The Eighth Amendment's prohibition against cruel and
unusual punishment, U.S. Const. amend. VIII, governs the use of
force by prison officials against convicted inmates. Campbell v.
Sikes, 169 F.3d 1353, 1374 (llth Cir. 1999). In order to
establish an Eighth amendment excessive force claim against
Defendants, Oliver must prove both an objective and subjective
component. That is, he must show that the alleged wrongdoing
was objectively "harmful enough" to establish a constitutional
violation and that the Defendants "act[ed] with a sufficiently
culpable state of mind", i.e., that the defendant acted
"maliciously and sadistically to cause harm." Hudson v.
McMillian, 503 U.S. 1, 7, 112 S. Ct. 995, 117 L. Ed. 2d 156 & 8,
112 S. Ct. 995, 999, 117 L. Ed. 2d 156 (1992) (citations
omitted).

Subjectively, Oliver must establish that "force was
applied. . .maliciously and sadistically to cause harm[,]" as

opposed to being applied "in a good-faith effort to maintain or restore discipline[.]" Hudson, *supra*, 503 U.S. at 7; see also Whitley v. Albers, 475 U.S. 312, 320-321, 106 S. Ct. 1078, 1085, 89 L. Ed. 2d 251 (1986)("[W]e think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.") In making this determination, the Court considers the need for application of force, the relationship between the need and the amount of force used, the threat reasonably perceived, any efforts made to temper the severity of a forceful response, and the extent of injury suffered. Hudson, 503 U.S. at 7 (citing Whitley, 475 U.S. at 321); see also Campbell, *supra*, 169 F.3d at 1375 ("Hudson and Whitley outline five distinct factors relevant to ascertaining whether force was used 'maliciously and sadistically for the purpose of causing harm': (1) 'the extent of injury'; (2) 'the need for application of force'; (3) 'the relationship between that need and the amount of force used'; (4) 'any efforts made to temper the severity of a forceful response'; and (5) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by the reasonable officials on the basis of acts known to them.").

Before analyzing Oliver's claims, the Court has engaged in an exhaustive review of the record, including the medical records, statements by all involved parties and witnesses, incident reports, Use-of-Force investigation reports, and disciplinary hearings, records, and reports, and finds that Oliver's assertions regarding the July 10th incident are contradicted by the record evidence.

Not surprisingly, Defendants, through sworn affidavits, dispute Oliver's version of the July 10th incident[5]. (Docs. 48-2, 48-3 48-4, 48-5, 48-6, 48-7, 70, 72). Defendants contend that on July 10, 2011, Oliver was confined to segregation and had at least one prior disciplinary infraction involving threats and an assault against officers although he had only been in ADOC custody for eight (8) months at the time. (Doc. 48-1 at 3-4). According to Defendants, Oliver became upset because officer Kimbrel, who had come to take Oliver to receive a haircut, removed papers from Oliver's cell that had been covering his observation window, in violation of segregation policy. (Doc. 48 at 4; Doc. 48-2 at 2). When Oliver reached the area for his haircut, he complained about the removal of the papers and began

---

[5] Defendants J. Johnson, Broadhead, Kimbrel, Betts, Forney, Bailey, Reynolds and Armstrong, submitted affidavits that directly dispute Oliver's version of the July 10th incident.

to engage in threatening and aggressive conduct. Officer J. Johnson warned Oliver that threats would not be tolerated, whereupon, Oliver attempted to aggressively stand up. In response, J. Johnson restrained Oliver in his seat. (Doc. 48-4 at 1-2, Doc. 72). Oliver then kicked J. Johnson in his shin and spat on J. Johnson's chest. (Id.). J. Johnson attempted to place his left hand on Oliver's shoulder to prevent him from getting up, but Oliver continued to attempt to get up. Other officers arrived on the scene. Officer Betts administered a one-second burst of Sabre Red and Officers Broadhead and Betts then took Oliver to the ground. (Id.). At that time, all force ceased and Oliver was taken to the Health Care Unit where the medical staff examined Oliver and completed a body chart, which indicates no injuries. Also, officer Bailey took photographs of Oliver's body (Id., at 5)[6]. After leaving the Health Care Unit, Oliver was returned to the area for his haircut, which was completed without incident. (Id., at 5-6).

The medical records from July 10, 2011 reflect that Oliver reported that his face was burning, and that he had been pepper sprayed. The medical records also reflect that Oliver

---

[6] Defendants submitted a number of pictures taken of Oliver's body immediately after all three incidents. The pictures are grainy and difficult to make out; thus they are of little value.

complained of arm pain, but he had no cuts or abrasions or signs of trauma. (Doc. 48-1 at 11). Further, a couple of hours after the incident, an incident report was generated which reflects that at 12:15 a.m. on July 10, 2011, after being released from his segregation cell M-26, Oliver became upset because officer Kimbrel had removed the paper that he was using to cover the observation window to his cell. (Doc. 48-1). The report reflects that Oliver stated "You fucking bitches got no right to go in my cell and take off my window!". And "I ain't scare of yall! I'll take all of ya'll down. I am an ex-convict.!" (Id.). When Oliver was seated in the shower area to await his haircut, Sargent J. Johnson began to counsel Oliver that threatening officers would not be tolerated, and in response, Oliver began with the threats again, and aggressively attempted to stand up.

At that point, J. Johnson restrained Oliver and Oliver kicked J. Johnson in his right shin and spit on his chest. As J. Johnson attempted to restrain Oliver with his right hand and to turn Oliver's head away from him, Oliver became more violent and repeatedly kicked his legs and attempted to get out of the chair into a standing position. Officer Betts administered a one second burst of chemical agent "Sabre Red" to Oliver's facial area and both officers Betts and Broadhead took Oliver to the ground to gain control of him. Immediately after the

incident, Oliver was taken to the Health Care Unit for decontamination and medical assessment.  Oliver was treated by Nurse Billy Booker and pictures were taken of him.  Oliver was taken back for his regulation haircut, which he received without further incident.  The report reflects that statements were taken from officers Broadhead and Betts, but Oliver refused to give a statement. (Doc. 48-1 at 5-8).

The record also contains a Use-Of-Force Investigative Report dated July 14, 2011 and prepared by Captain William Howard. (Doc. 48-1 at 8).  In the Investigative Report, Captain Howard found that on October 11, 2011, Oliver had become combative and kicked Sargent J. Johnson in the right shin and spit on him, that a one second burst of Sabre Red was administered to Oliver's face area, that Oliver was taken to the ground to gain control of the situation, and that the use of force was necessary to maintain control over Oliver and to complete the task of his haircut, as well as escort him to the Health Unit. (Doc. 48-1).

The record reflects that Oliver was charged with assaulting a correctional official (rule #29) and making threats (rule # 44), and disciplinary hearings ensued. (Doc. 48-1 at 14-28)  The hearing on the charge of making threats was conducted on July 19, 2011 at 5:40 a.m. (Doc. 48-1 at 14).  At the hearing, Oliver

testified that Kimbrel took something out of his room (a
newspaper and a drawing) and that when he told J. Johnson about
the problem, J. Johnson told him to shut the fuck up and hit him
in the face while he was in handcuffs, and that they all started
beating him.  Ricky Gilland, an inmate, appeared as Oliver's
witness.  He testified that he did not see anything-that he was
getting his hair cut.  He also testified that he did not see him
making any threats, and that he just saw them fighting, and then
they carried him off. (Doc. 48-1 at 15).

J. Johnson testified that he and Kimbrel were supervising
haircuts on M-Tier, and that when Oliver came in and sat in the
chair to get his haircut, he stated that "that bitch went and
took paper out of my window.  Ya'll gonna quit fuckin with me or
I'm gonna start getting at ya'll.  J. Johnson testified that he
instructed Oliver to stop making threats, and that Oliver
stated, in a threating tone, that "I ain't scared of ya'll.
I'll take all of ya'll down, I'm an ex-convict. (Doc. 48-1 at
15).  In his final written statement to the hearing officer,
Oliver asserts that "There was no apparent threat made to [Sgt.]
Johnny L. Johnson or his staff! There was no need to force Mr.
Oliver in a chair, punch him, or spray him with chemical agent!"
(Id., at 18).

At the conclusion of the hearing, the hearing officer found

19

that Oliver did make threatening statements towards officers J. Johnson and Kimbrel and recommended 30 days disciplinary segregation. The Warden approved the hearing officer's recommendation. (Id., at 16).

The record reflects that a hearing on the charge of assaulting a correctional official was conducted on July 28, 2011, at 3:45 a.m. (Id., at 22). J. Johnson testified that Oliver became aggressive and attempted to get up from his chair while he was being counseled about his threatening behavior towards the officers. J. Johnson testified further that as he attempted to restrain Oliver, Oliver kicked him in the right leg and attempted to get up again. According to J. Johnson, as he continued to restrain Oliver, Oliver spat on him in his chest area. At that point, Betts administered the chemical agent "Sabre Red" in order to end Oliver's behavior. (Id.).

The hearing report reflects that Oliver was removed from the hearing due to his "extremely disruptive behavior"; however, he was given and took advantage of an opportunity to submit written questions and a written statement. (Id., at 26-28). In his final written statement, which was submitted mere days after the July 10th incident, Oliver asserts that "Not only did [J. Johnson] step out of bounds as a[n] officer by so called being a mental health counselors, but he also put his hands on Mr.

Oliver in a threatening manner as he stated in his disciplinary actions numerous amounts of times!" (Id.). In his second written statement regarding the July 10th incident, Oliver asserted that he was poked in the nose several times, punched in the head, choked, stomped and his head was rammed into the brick wall going towards the health unit. Inmate Ricky Gilland's testimony from the first hearing was provided to the hearing officer. (Doc. 48-1 at 23). The hearing officer concluded that on July 10, 2011, that Oliver had violated rule #29-Assault on Person(s) associated with ADOC by kicking J. Johnson in the right leg and spitting on him in his chest area. The hearing officer's recommendation of 45 days disciplinary segregation and loss of privileges was approved by the warden. (Id., at 24).

The undersigned finds that the incident report, use of force investigation, medical report, disciplinary hearing records, including Oliver's first final written statement regarding the July 10, 2011 incident, flatly contradict his later versions of the facts. Indeed, when Oliver was taken to the medical unit, immediately following the incident, not only were no injuries or distress observed, but Oliver reported that he had been pepper sprayed, and that he had right hand pain, both of which are consistent with Defendant's version of the facts. Further, the records reflect and Oliver does not dispute

that after leaving the medical unit, officers returned him to the area for his haircut, and his hair was cut without further incident. (Id., at 8).

Also telling is the fact that nowhere in the medical report or disciplinary hearing records, including Oliver's first final written statement regarding the July 10, 2011 incident, does Oliver deny that he kept attempting to stand up, or that he kicked and spit on officer Johnson [7]. Additionally, these documents do not obtain any assertion by Oliver that his pants were pulled off during the July 10th incident and that he was sexually taunted[8]. Further, while Oliver's witness inmate Ricky

_____

[7] In fact, in his written submission for the hearing, Oliver pointed out that he is a Marine Vet and capable of handling himself against J. Johnson. (Doc. 48-1 at 20).

[8] In fact, although Oliver relates three instances (namely July 10, 2011, August 24, 2011, and November 11, 2011) in which his pants were allegedly "snatched off", and he was told "you got a pretty booty" (on July 10th) and "suck my penis" (on August 24th), the disciplinary records, including Oliver's testimony, and his hand written statements and questions, are completely devoid of any assertions by him that his pants were "snatched off" or that he was subjected to sexual taunting. Moreover, even viewing Oliver's assertions in the light most favorable to him, they do not establish harassment that was severe and pervasive. With respect to Defendants Bailey and Armstrong, Oliver only identifies one instance on July 10, 2011 when they allegedly snatched off his pants and made sexual statements. Likewise, Oliver only identifies one instance, August 24, 2011, when Defendants Daughtry and Kimbrel allegedly pulled off his pants and made sexual remarks. With respect to the remaining

22

Gilland denied hearing Oliver make a threat, inmate Gilland did

not and has not offered any testimony disputing Defendants'

assertion that Oliver kept attempting to stand up, and that he

kicked and spit on Officer Johnson[9]. Thus, Oliver's version of

the facts are rejected to the extent they are contradicted by

the record evidence[10]. See <u>Vicks v. Knight</u>, 380 Fed. App'x 847,

---

Defendants, while Oliver contends that his pants were snatched
off on November 11, 2011, he has not identified who snatched off
his pants, or engaged in sexual taunting. Accordingly, he has
failed to establish that any of the Defendants engaged in sexual
harassment that can be deemed severe and pervasive. <u>Boxer X v.
Harris</u>, 437 F.3d 1107, 1111 (11th Cir. 2006)("[S]evere or
repetitive sexual abuse of a prisoner by a prison official can
violate the Eighth Amendment.") <u>Boddie v. Schnieder</u>, 105 F.3d
857, 860-61 (2d Cir. 1997)(finding prisoner's allegations that
he was "verbally harassed, touched, and pressed against without
his consent" were insufficient to satisfy the objective element
of his attempted § 1983 sexual abuse claim), <u>Allen v. McDonough</u>,
2011 U.S. Dist. LEXIS 107984, at *14 (N.D. Fla. Aug. 17, 2011)
(collecting cases in support of the proposition that isolated
incidents of non-severe sexual harassment are not sufficient to
meet the cruel and unusual punishment standard).

[9] The undersigned observes that Oliver filed two Gilland
affidavits. The affidavits, which are clearly in Oliver's
handwriting, and essentially repeat allegations made in Oliver's
complaints, are not consistent with Gilland's hearing testimony.
Moreover, nowhere in the affidavits does Gilland deny Defendants'
allegations that Oliver kept attempting to stand up, and that he
kicked and spit on Officer Johnson. (Docs. 29 at 1-3, 74 at 15-
17).

[10] Moreover, Oliver's claim that Stanton and Armstrong took his
shower shoes and he never got them back fails to state a due
process claim because a post-deprivation remedy was available to
him at the time of the alleged seizure of his property. <u>Hudson v.</u>

852 (11th Cir. 2010) (when resolving factual disputes in summary judgment motions, a district court may ignore the plaintiff's version of the facts when it is clearly contradicted by the other evidence of record, including the defendants' affidavits, incident reports, and medical records.); Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

As indicated, in order to establish an Eighth Amendment claim against the Defendants, Oliver must prove both an objective and subjective component. That is, he must show that the alleged wrongdoing was objectively "harmful enough" to

_____

Palmer, 468 U.S. 517, 533, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)("[W]e hold that an unauthorized intentional depravation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy"). Oliver has an available remedy in a tort action for this alleged deprivation. Dawson v. City of Mongtomery, 2008 US. Dist. LEXIS 19833, 2008 WL 6599800 (M.D. Ala. Mar. 6, 2008).

establish a constitutional violation and that Defendants "act[ed] with a sufficiently culpable state of mind," *i.e.*, that they acted "maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7-8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992).

Turning first to the subjective element of Oliver's claims, the Court adopts Defendants' version of the facts as the medical records, incident report and disciplinary records contradict Oliver's version of the facts surrounding the July 10th incident and confirm Defendants' version. See Vicks, 380 Fed. App'x at 852; Scott, 550 U.S. at 380. Thus, the force in question is J. Johnson's grabbing of Oliver by the shoulder, forcing him in the chair, and securing of Oliver's chin, as well as Betts' administering of a burst of Sabre-Red to Oliver's face and working with Broadhead and Armstrong to take Oliver to the ground in an attempt maintain security.

In Hudson, the Supreme Court recognized that, whenever guards use force to keep order, they "must balance the need 'to maintain or restore discipline' through force against the risk of injury to inmates." Hudson, 503 U.S. at 6 (quoting Whitley v. Albers, 475 U.S. 312 (1986)). Thus, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically

25

to cause harm." Id. In making this determination, the Court considers the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived, any efforts to temper the severity of a forceful response, and the extent of injury suffered. Id., 503 U.S. at 7 (citing Whitley, 475 U.S. at 321).

Before the application of any force by Defendants on July 10, 2011, Oliver was upset that Kimbrel had removed the magazine and drawing that Oliver had covering his window. When J. Johnson attempted to counsel Oliver, he attempted to stand up from his chair. J. Johnson then tried to force Oliver back in his chair, and Oliver proceeded to kick and spit on J. Johnson. At that point, J. Johnson attempted to restrain Oliver by grabbing his chin and Oliver began aggressively kicking and trying to get up from the chair. So, a "Code Red" was called and Betts, and several other officers, rushed to the scene, and Betts sprayed Oliver with Sabre Red. Betts, Broadhead, and Armstrong worked together to gain control of the situation by taking Oliver to the ground. (Doc. 48-1 at 14, 22-23).

Given these facts, J. Johnson could have reasonably believed that Oliver's behavior in attempting to stand up from the chair was a threat to prison order and discipline and could have reasonably believed it necessary to use some measure of

force to subdue him.   Thus, J. Johnson's grabbing Oliver and forcing him back in his chair was justified under the circumstances as the nature of the altercation indicates that the force was applied in "a good-faith effort to maintain or restore discipline," not "maliciously and sadistically to cause harm." Hudson, 503 U.S. at 6.   The same holds true for J. Johnson's grabbing Oliver's chin in efforts to restrain him. Likewise, Betts, Broadhead, and Armstrong were justified in their role in the altercation as they were responding to the "Code Red", which was called after Oliver kicked J. Johnson in the shin and spat on his chest, and began kicking and aggressively resisting J. Johnson's control.   These facts indicate that once Betts arrived to answer the "Code Red", he could have reasonably believed that the Sabre Red was necessary to subdue Oliver and that Betts, Broadhead, and Armstrong also held the beliefs that their force was necessary to restrain Oliver who was continuing to resist the officers' control. Particularly in the state of the "Code Red" in the segregation unit, such force is indicative of the Defendants' "good-faith effort to maintain or restore discipline". Id.   Thus, Oliver has failed to establish the subjective element of his Eighth Amendment claim.

Assuming *arguendo*, that Oliver has established that the

Defendants' alleged conduct, in spraying, stomping and beating him, were, in fact, malicious, he has failed to show that Defendants' application of force was objectively "harmful enough" to establish a constitutional violation. Inherent in the protection afforded by the Eighth Amendment is the principle that "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" Clark v. Johnson, 2000 U.S. Dist. LEXIS 15347, at *34, 2000 WL 1568337 (S.D. Ala. September 20, 2000) (unpublished) (quoting Hudson, 503 U.S. at 9-10). Indeed, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" Hudson, 503 U.S. at 9 (citations omitted). The objective component of an Eighth Amendment excessive force claim "necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Hudson, 503 U.S. at 9-10 (quoting Whitley, 475 U.S. at 327).

While the Supreme Court in Hudson did not define "de minimis use of force," it did hold that neither "serious" nor "significant" injury is required to satisfy the objective component of an Eighth Amendment claim, nor is any arbitrary quantum of injury an absolute requirement of an excessive force

28

claim, apparently out of concerns that certain forms of torture are capable of inflicting extreme pain without leaving any mark or tangible injury. 503 U.S. at 9 ("Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury."). At the same time, the court suggested that the degree of injury received is relevant to determining whether more than *de minimis* force was used. See Id., 503 U.S. at 10 (blows causing bruising, swelling, loosened teeth and a cracked dental plate do not constitute a *de minimis* use of force).

In the present case, there are no allegations of torture designed to inflict extreme pain without leaving tangible injury or conduct that otherwise is so egregious that one could reasonably call it repugnant to the conscience of mankind. Therefore, if Oliver suffered only *de minimis* injuries that would be an important factor in determining whether more than *de minimis* force was used.

Based on the evidence before the Court, the undersigned finds that the force used on July 10th was *de minimis*. Plaintiff's medical records show that, when he was examined at the prison infirmary immediately after the incident, there were no marks, bruises, or injuries of any kind anywhere on his body,

29

and he reported only that "my face is burning...I have been pepper sprayed" and complained of pain to his arm that had been broken a few months earlier at another facility. (Doc. 48-1 at 11). Additionally, Oliver does not dispute that after leaving the infirmary, he was returned to the haircut area and had his hair cut without incident. Further, there are no medical records evidencing any subsequent disability or infirmity arising from the incident. Accordingly, the undersigned finds that Oliver has failed to establish a constitutional claim based on the amount of force used by Defendants on July 10, 2011.

### b. AUGUST 24-25, 2011 INCIDENT

As outlined *supra*, Oliver alleges that on August 24, 2011, he engaged in a verbal dispute with Defendant Carroll, that Carroll left Oliver's cell stating that he was going to "whip [Oliver's] ass" and he returned with J. Johnson, R. Johnson, Daughtry, Stanton, Kimbrel, Gipson, and Broadhead, all of whom began repeatedly spraying, punching, kicking, and stomping Oliver, and ramming his head into the walls. (Doc. 28 at 8). Oliver contends that on the same night, his cell was "stripped down" and "fecal water" was left on the floor where he was left for three (3) weeks with no "running water" and "flies and maggots [were] crawling in the fecal water that was on the floor". (Id.).

Before analyzing Oliver's claims, the Court engaged in an exhaustive review of the record, including the medical records, statements by all involved parties and witnesses, incident reports, and Use-of-Force investigation reports, regarding the August 24-25 incidents. Based on said review, the Court rejects Oliver's version of the facts to the extent that he claims that he was repeatedly punched, kicked, stomped, and sprayed, and that his head was rammed against the wall several times, as his version is overwhelmingly contradicted by the other evidence of record. See Vicks, 380 Fed. App'x at 852; Scott, 550 U.S. at 380. Not surprisingly, affidavits from J. Johnson, Kimbrel, Broadhead, Stanton, Gipson, Daughtry, R. Johnson, and Carroll directly conflict with the version of events that Oliver sets forth in his complaint and affidavit. (Docs. 48-2, 48-3, 48-8, 48-9, 48-10, 48-11, 72).

More importantly, the Incident Reports, Use-of-Force investigation report and medical records contradict Oliver's version of the August 24-25 incident. (Doc. 48-1 at 29-31). The incident report was generated on August 24, 2011, a little over an hour after the incident. The report reflects that R. Johnson, Carroll, Stanton, and Broadhead were conducting searches of the K-tier at 10:30 pm., and that when R. Johnson requested Oliver to come to the door so that restraints could be applied, he

responded "Why you fuckin with me?".  When R. Johnson instructed him a second time, he responded "I ain't cuffin' up for no shakedown", grabbed a cup of an unknown substance, started to move towards the cell, and threaten to throw the contents on R. Johnson.  At that point, R. Johnson administered a one second burst of chemical agent Sabre Red mace into Oliver's facial area in accordance with Administrative Regulation #312, and Oliver dropped the cup.  R. Johnson secured the tray door and notified J. Johnson of the incident via two-way radio.  J. Johnson, Craft and Kimbrel responded.  After questioning R. Johnson, J. Johnson instructed R. Johnson to leave the area.  J. Johnson then instructed Oliver to come to the door to be escorted to the Health Unit for decontamination.  Oliver was handcuffed and taken to the Health unit for assessment.  Oliver was assessed and photographed.  Before his return, Oliver's cell was searched, and a large quantity of trash was removed.  Also, the cup was recovered, and it smelled of urine.  Oliver was returned to cell K-56 without incident.  The incident report reflects that Oliver declined to provide a written statement. (Doc. 48-1 at 29).

The record also contains a Use-Of-Force Investigative Report that was completed by Captain James Power on August 25, 2011 at 12:18 p.m. (Doc. 48-1 at 31).  Powers found, after an extensive review of the incident report and interviews, that on

August 24, 2011, at approximately 10:30 p.m., Oliver had refused
R. Johnson's repeated directives to come to the door to be
handcuffed for a cell search, and at one point, came towards him
with a cup filled with an unknown substance. In response,
Oliver administered a one-second burst of Sabre Red to Oliver's
facial area, and he ceased his aggressive behavior. J. Johnson
was notified and he arrived at Oliver's unit with Kimbrel and
Craft. R. Johnson was instructed to leave the area. After
being instructed by J. Johnson to come to the cell door to be
handcuffed, Oliver complied. He was escorted to the health care
unit for a medial assessment, and upon completion, was escorted
back without incident. Powers concluded that the force was
justified. (Id.).

The record also contains an incident report dated August
25, 2011. (Doc. 48-1 at 36). In the report, it was reported
that when R. Johnson passed by Oliver's segregation cell K-56,
he observed a large quantity of water coming from under the cell
door. Upon approaching the area, he observed Oliver repeatedly
flushing the toilet and causing water to overflow into the cell
and the tier. R. Johnson reported the incident to J. Johnson by
telephone and was instructed to cut the water to the cell off to
prevent further flooding. J. Johnson in turn notified Craft and
Kimbrel who reported to the area. Kimbrel handcuffed Oliver,

and he along with Stanton, Daughtry, and Broadhead escorted Oliver to the Health Care Unit for medical assessment. The incident was reported to Captain Power who determined that Oliver would be placed in a stripped cell status in accordance with standard operating procedure #009-017. As a result, Oliver's property was secured in stored property room, and a Water Allowance Sheet was initiated. (Id.). The record also reflects that a few months prior to this incident, in May 2011, Oliver was recommended for a mental health review because he "[t]hrew cups or urine in other inmates cells." (Doc. 48-14 at 16).

Further, Oliver's medical records and his own statements to the medical personnel directly contradict his version of the events and fail to support any claims related to the alleged physical abuse. (Doc. 48-1 at 33). In his complaint, Oliver contends that he was repeatedly punched, kicked, and stomped in his face and different parts of his body, and that his head was rammed against the panel of the doorway several times, by nine (9) prison guards.[11] (Doc. 28 at 8-10). And, Oliver contends

_____

[11] While Oliver's amended complaint alleges, on four (4) separate occasions, that the incident involved nine (9) prison guards (Doc. 28 at 8-10), in Oliver's response to Defendants' summary

that he was maced several times and as a result, he suffered an asthma attack and was rushed a new inhaler by the medical staff. (Id.). Yet, in a medical assessment immediately following the incident, Oliver reported to the medical personnel only that "[t]hey sprayed me & mace in my cell". (Doc. 48-1 at 33). Additionally, while Oliver contends that his head was repeatedly rammed against the doorway panel and he was repeatedly punched, kicked, and stomped by nine (9) guards, the medical records immediately following the incident reflect that Oliver was in no distress, his vital signs were normal, his body chart was clear, and no injuries were noted. (Id.). Additionally, other than Oliver's eyes being reddened from the guards' use of Sabre Red, no lumps, bruises, tenderness, redness, or open wounds were noted on Oliver's body chart to corroborate Oliver's version of the events. (Id.).

In addition, the record reflects that on the next day, August 25, 2011, Oliver submitted a medical request form and his statements on the medical request form directly contradict his version of the event. (Doc. 48-10 at 10). While Oliver contends that he was sprayed with pepper spray until he suffered an

_____

judgment motion, Oliver contends that the incident only involved eight (8) guards. (Doc. 74 at 6-7).

asthma attack and was rushed an inhaler by the medical staff, in the medical request form that Oliver submitted on August 25, 2011, Oliver stated, "[l]ast night 8-24-11 during a cell search Sergeant C. Kimbrel took my inhaler! I need another one" (Doc. 48-14 at 10). This clearly contradicts his assertion that on the 24th, he suffered a life-threatening asthma attack that required that medical staff rush him a new inhaler, which he kept that night. Additionally, while Oliver contends that he was repeatedly punched, stomped, kicked, and his head was rammed against the door several times, on the same medical request form, in addition to the request for an inhaler, Oliver stated, "I'm experiencing *minor* pain in my left arm which was broken in Jan. 2011! Need an arm guard. My top portion of my cranium (head) [is] severely itching for about 3 weeks & I'm unsure why." (Id.) (parentheses in original; emphasis added).

Oliver's own medical request form contradicts his version of the events, particularly his contention that he was severely beaten by nine (9) guards who repeatedly punched, kicked, stomped, and rammed his head into the wall several times; yet, only a few hours later, the only medical complaints Oliver lists are his need for a new inhaler for his chronic asthma condition, an itchy scalp for about three (3) weeks, and lingering "minor" pain from his arm that was broken six (6) months earlier.

36

Oliver fails to complain of any pain, soreness, swelling, or bruising from the alleged punches, kicks, stomps, and ramming of his head into the door by the nine (9) guards. As this evidence, along with the overwhelming record evidence outlined *supra*, clearly contradicts Oliver's version of the events, the Court rejects Oliver's version of the facts to the extent that Oliver claims he was repeatedly punched, stomped, kicked, that his head was rammed into the doorway several times, and that he was sprayed with Sabre Red until he suffered an asthma attack, as a reasonable fact-finder could not believe Oliver's version of the facts. See Vicks, 380 Fed. App'x at 852; Scott, 550 U.S. at 380.

### i. EXCESSIVE FORCE

As outlined *supra*, the force at issue involving the August 24, 2011 incident was R. Johnson's administering of the Sabre Red spray to Oliver's face when Oliver threatened to throw the liquid substance on him. In order to establish an Eighth Amendment excessive force claim against R. Johnson regarding his administration of a one-second burst of Sabre Red pepper spray, Oliver must prove both an objective and subjective component. That is, Plaintiff must show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation and that R. Johnson "'act[ed] with a sufficiently

culpable state of mind,'" i.e., that the defendant acted "maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7.

Subjectively, then, Oliver must establish that the "force was applied . . . maliciously and sadistically to cause harm[,] as opposed to being applied "in a good-faith effort to maintain or restore discipline[.]" Id. In the instant case, there is simply insufficient evidence that would support a finding that R. Johnson used force "maliciously and sadistically" for the purpose of causing harm.

First, as found by the Use-of-Force investigation, there was need for application of some force because of Oliver's refusal to follow R. Johnson's orders to submit to handcuffs in order to conduct a shakedown of his cell. Compare Danley v. Allen, 540 F.3d 1298, 1303 (11th Cir. 2008) ("[P]epper spray is an accepted non-lethal means of controlling unruly inmates . . . ."), overruled on other grounds as recognized by Randall v. Scott, 610 F.3d 701 (11th Cir. 2010), with Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984) ("[I]t is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain. . . . The use of mace, tear gas or other chemical agent of the like nature

when necessary . . . to subdue recalcitrant prisoners does not constitute cruel and inhumane punishment. . . . The 'use of the substance [] in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required.'"), cert. denied, 470 U.S. 1085, 105 S. Ct. 1846, 85 L. Ed. 2d 144 (1985).

Second, given the need for force, the Court finds that the evidence is insufficient for a reasonable jury to find that the administration of a one-second burst of pepper spray was unreasonable, malicious, or sadistic. Third, the extent of the injury also in no way supports a reasonable finding that the force used was used maliciously and sadistically. See Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999). Oliver sustained only temporary redness and burning of his eyes, which were admittedly flushed of the pepper spray on the date of the "injury."

Finally, the fact that Oliver was immediately escorted to the Health Care Unit immediately after the administration of the pepper spray for treatment also undermines Oliver's unsupported allegation that R. Johnson's conduct was malicious or sadistic inasmuch as the officers took steps to immediately ensure that Oliver received prompt treatment for his relatively minor

39

injuries.

Turning to the objective component, the alleged injuries suffered by Oliver are *de minimis*. Oliver's eyes and face were immediately cleaned in the Health Care Unit after R. Johnson's administration of a one-second burst of pepper spray and Oliver sustained no injury to the eyes cause by the pepper spray. These *de minimis* eye injuries, as well as all other facts and circumstances heretofore explored, establish that R. Johnson's administration of a one-second burst of pepper spray into the area of Oliver's face constitute no more than a *de minimis* use of force. Cf. Wilkins v. Gaddy, 559 U.S. 34, 37, 130 S. Ct. 1175, 1178, 175 L. Ed. 2d 995 (2010) ("Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts."). Thus, Oliver's claims are insufficient to establish a constitutional violation under the Eighth Amendment.

### ii. CONDITIONS OF CONFINEMENTS

Oliver also alleges that the Defendants violated his Eighth Amendment rights by confining him in a strip cell for three (3) weeks and depriving him of his personal property and running water. (Doc. 28 at 9). The undisputed evidence shows that Oliver's cell was stripped on August 25, 2011, after he

repeatedly flushed the toilet and caused the water to overflow in his cell and flood the tier. (Docs. 48-1 at 37; 48-10).

As discussed above, an Eighth Amendment claim has two components, "an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind." Sims v. Mashburn, 25 F.3d 980, 983 (11th Cir. 1994). In addition, Plaintiff must show "that the constitutional violation caused his injuries." Marsh v. Butler County, Ala., 268 F.3d 1014, 1028 (11th Cir. 2001). Plaintiff has failed to establish any of these elements.

With respect to the objective component, prison conditions constitute cruel and unusual punishment only when they result in the "unquestioned and serious deprivation of basic human needs." Rhodes, 452 U.S. at 347. The law is clear that "the Constitution does not mandate comfortable prisons." Id., 452 U.S. at 349. "[R]outine discomfort is part of the penalty that criminal offenders pay for their offenses against society[.]" Hudson, 503 U.S. at 9 (citations and internal quotation marks omitted). All that is required is that prison officials "ensure that inmates receive adequate food, clothing, shelter, and medical care, and . . . 'take reasonable measures to guarantee

the safety of the inmates[.]'" <u>Farmer v. Brennan</u>, 511 U.S. 825, 828, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (citations omitted).

With respect to the subjective component of Oliver's Eighth Amendment claim, "[w]hen the conduct in question involves any measure taken to prevent a security threat or restore official control, the Eighth Amendment inquiry is 'whether force was applied in a good faith effort to maintain or restore discipline or inflicted maliciously or sadistically for the very purpose of causing harm.'" <u>Sims</u>, 25 F.3d at 984 (quoting <u>Hudson</u>, 503 U.S. at 6).

In this case, Defendants engaged in the strip cell procedure, pursuant to standard operating procure, as a security measure used for inmates who intentionally create a security, safety, or health hazard. (Doc. 48-1 at 36). According to the incident report, after Oliver was observed repeatedly flushing the toilet in his cell, thereby causing water to overflow onto the floor of his cell and the tier, he was sent to the Health Unit for medical assessment, and then per orders from Captain Powers, Oliver was placed in Stripped Cell status in accordance with SOP #00-9-017, his property was secured in the Stored Property Room, a Water Allowance Sheet was initiated, and Oliver

received a disciplinary violation for violation of Rule #62 – Intentionally Creating a Security, Safety, Health Hazard. (Id.).

Taking Oliver's allegations as true, he was deprived of his personal property and running water for three (3) weeks because he flooded his cell in his attempt to wash the mace off of the floor. (Doc. 48-1 at 37). While, unquestionably, Oliver's confinement in the strip cell for three (3) weeks was unpleasant and uncomfortable, Oliver has not shown that he was denied adequate food, clothing, shelter, or medical care during his confinement in the strip cell, nor has he shown that he suffered any injury from his strip cell confinement. Moreover, Oliver has not shown that his confinement in the strip cell was malicious and sadistic and for the very purpose of causing harm.

To the contrary, in addition to being provided adequate food, clothing, and shelter while he was in the strip cell, Oliver was provided medical care as he completed the medical request form discussed *supra*. (Doc. 48-1 at 14). While Oliver did complain to the medical staff that he needed a new inhaler and that he was experiencing "minor" pain in his arm that was broken six (6) months earlier and severe itchiness on his scalp for three (3) weeks; he never complained to the medical staff about any problem related to his confinement in the strip cell. (Id.).

The "broad and idealistic concepts" of the Eighth Amendment "must be balanced against competing penological goals." LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993) (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976) (internal quotation marks omitted)). Prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979).

Because Oliver has failed to allege circumstances that would establish a deprivation so grave as to deprive him of the minimal civilized measures of life's necessities, he has failed to meet the objective component of his Eighth Amendment claim. Cf. White v. Marshall, 2008 U.S. Dist. LEXIS 90351, 2008 WL 4826283 (M.D. Ala. Nov. 5, 2008) (unpublished) (plaintiff's confinement in a strip cell for thirty days with only a drain in the floor for urinating, no clothing except for a paper gown, no mattress for twenty-four days, and no blanket was not a deprivation of "the minimal civilized measure of life's necessities."); Mosley v. Bishop, 2009 U.S. Dist. LEXIS 64103, 2009 WL 1564778 (S.D. Ala. July 21, 2009) (denial of mattress and bed linens for nine days, which forced inmate to sleep on a "cold, raw steel slab," did not rise to the level of a

deprivation of the minimal civilized measure of life's necessities or of a basic human need.); <u>Brown v. Goodman</u>, 2010 U.S. Dist. LEXIS 52843, 2010 WL 2202515 (S.D. Ala. April 19, 2010) (confinement in strip cell for eight days where plaintiff had to sleep on the "hard iron bed frame a whole week" and "was very cold day (sic) and every night" did not pose "an unreasonable risk of serious damage to his future health or safety[]").

Furthermore, because Oliver has failed to allege circumstances that would establish that his strip cell confinement for three (3) weeks was malicious, sadistic, and engaged in for the purpose of causing harm, he has failed to meet the subjective component of his Eighth Amendment claim as well. Further, Oliver has failed to show that any of the named Defendants were responsible for the decision to place in in stripped cell status. Indeed, the undisputed evidence reflects that Captain Powers made that determination after investigating the circumstances surrounding the overflow of water in Oliver's cell and the tier on August 25, 2011. (Doc. 48-1 at 36). Accordingly, Oliver has failed to state a constitutional violation based upon his three (3) week confinement in a strip cell, and Defendants are entitled to summary judgment on this claim.

### c. NOVEMBER 12, 2011

As noted *supra*, Oliver claims that on November 12, 2011, at approximately 3:00 a.m., Broadhead, who was accompanied by Stanton and Gipson, handcuffed Oliver and began searching his cell. According to Oliver, after he commented to a fellow inmate that "man it's too early in the morning for this cramp (sic)", Stanton and Gipson instructed Oliver to "shut the fuck up!", to which Oliver replied, "I'm a grown man, and you don't tell me to shut the fuck up!". Then, Stanton grabbed Oliver by the back of his head and began repeatedly banging the front of his head against the wall. (Doc. 14 at 10; Doc. 28 at 3). Oliver contends that Kimbrel, Tyus, and Andrews joined the other guards in his cell, that they snatched off his pants and boxers, that he was thrown on the bed, and the officers began punching, kicking, stomping, and choking him repeatedly in his head, face, chest, stomach, and ribs for at least ten (10) minutes. (Doc. 28 at 7; Doc. 74 at 4). Oliver further contends that despite informing the guards that he was suffering an asthma attack, the guards refused to stop the beating and continued to punch, kick, and stomp him in the face, ribs, and back as they took him on the elevator to the medical ward. (Id.). Once in the medical ward, Oliver contends that the medical staff documented that he suffered "two (2) black eyes, cuts, bruises, and swellings (sic)

all in different parts of [his] body" and a fractured right rib cage. (Id., at 7). Additionally, he contends that he received "two puffs" for his asthma attack and "a brand new inhaler!" (Id., at 7-8).

On the other hand, Defendants Kimbrel, Broadhead, Stanton, Gipson, Tyus, and Andrews have submitted affidavits that directly conflict with the version of events that Oliver sets forth in his complaint and affidavit. (Docs. 48-2, 48-3, 48-10, 48-12, 48-13, 53-1). Defendants also point to the Health Unit record dated November 11, 2011 (Doc. 48-1 at 40) that reflects that Oliver was examined within minutes of the alleged beating incident, and his only report was that "They busted my lip". (Id.). The medical record from Oliver's November 11, 2011 visit reflects that Oliver had a minor abrasion to his lower lip, that he was alert and oriented times three, that his skin was warm and dry, he was breathing easily, and his speech was clear and coherent, and no cute distress was noted. (Id.)

The medical record also reflects that on November 12, 2011, the date after the incident, Oliver submitted a sick call request. (Doc. 48-14 at 8). On the form, Oliver asserts that he was assaulted on November 12, 2011 and that he had a swollen and blacken left eye, bruises on his back and body, an "allergy cough", and a strenuous headache. (Id.). He also indicates that

his head was still itching, and that his shampoo had been ordered more than a month earlier. (Id.). Oliver also asserts that his legs and back were aching, and that he had a loose tooth and needed to see the dentist. (Id.).

The medical records reflect that Oliver was seen in the Health Unit on November 14, 2011, and he reported that he was assaulted on November 12, 2011. (Doc. 48-14 at 6-7). Oliver's chief complaint was a black eye and bruises. He also reported that "I have loose tooths" (sic). (Id., at 6). The medical records also document that on examination, Oliver had a black eye on the left side, he had abrasions on the left side of his neck, his left thigh was discolored and "blush-black', and he had a knot. (Id., at 7). It was also noted that Oliver's scalp was dry, he had small raised bumps on his scalp, and his scalp was non-flaky. (Id.).

The dental records reflect that in June 2011, Oliver made a request to see a dentist and advised that the teeth in the front of his month was broken by the police, and that he needed dental cleaning and the repair of "my 2 teeth". According to the dental records, Oliver received a filing in tooth # 9 on July 14, 2011. On November 23, 2011, Oliver was examined by the dentist and informed that tooth #7 needed to be extracted. The extraction took place on November 30, 2011. (48-14 at 20-21).

48

The medical records also reflect that in May 2012, after being transferred to another facility, Oliver complained of pain in his right rib cage, which he attributed to the physical alteration on November 12, 2011. (Doc. 48-14 at 5). Oliver claimed that the medical unit at Holman was supposed to have arranged to have his right rib cage x-rayed, but they failed to do so. The medical records include a nurse's notation that nothing in Oliver's medical jacket indicates that he was to have an x-ray, and that upon examination, Oliver's abdominal was normal and nothing out of the ordinary was present. (Id., at 3-4). Oliver was prescribed 200 mg. of ibuprofen for up to five (5) days. (Id.).

Also contained in the record is a Use-Of-Force Investigative Report that was completed by Captain Powers on November 15, 2011. (Doc. 48-1 at 41). The report reflects that Kimbrel, Tyus, Broadhead, Stanton, Andrews, and Gipson were conducting random shakedowns in the Segregation Unit and at approximately 3:00 a.m., Kimbrel, Stanton, and Broadhead handcuffed Oliver from behind to begin a search of his cell. (Id.). Oliver became verbally aggressive to Officers Stanton and Broadhead, and stated "While y'all shaking me down, I'll whip your ass. You can't do anything to me!" (Id.). Although Oliver was instructed to calm down, he continued to become

verbally aggressive towards the officers during the search. (Id.). Oliver was ordered to step into his cell and stand against the wall so that he could be stripped searched, and while he complied, he continued to complain. (Id.). As Stanton began to search Oliver's pants pockets, Oliver turned quickly and kicked Stanton on his right leg. (Id.). Stanton grabbed Oliver by the left arm and took him down to the bed to stop the assault. (Id.). Oliver's face struck the bed resulting in a minor abrasion to his lower lip. (Id.). No further force was needed and Oliver was escorted to the Health unit for a medical assessment at approximately 3:13 a.m. (Id.). By 3:20 a.m., he was returned to his cell without further incident. (Id.). Powers noted that Oliver would be charged with a Rule #29 violation for assault on a person associated with ADOC and a Rule #44 violation, for threats. (Id.).[12]

_____

[12] The record also contains an incident report that recounts much of the same information contained in the Use-Of-Force Investigative Report. (Doc. 48-1 at 39). In addition, it reflects that immediately prior to reaching Oliver's cell, the officers had conducted a search of inmate Kory Johnson's cell (M-20) and found a cellphone and charger hidden in his crotch area, the officers had conducted a search of inmate Rocky Langford's cell (L-26) and confiscated one hand-rolled tobacco cigarette, and the officers had conducted a search of Travis Poke (L-27) and found cigarettes and tobacco packets hidden inside Poke's crotch area. (Id.).

Oliver was charged with both violations and a disciplinary hearing was conducted on November 27, 2011. (Id., at 45). Officer Stanton testified that on the date of the incident, he and Gipson were conducting shakedowns in the Annex, they went to Oliver's cell and handcuffed him, and told him to step out of the cell while they searched his property. (Id., at 46). Stanton testified further that Oliver became angry and made threats such as "I'll whip your ass", that the officers placed Oliver against the wall and told him to clam down, that they then took Oliver inside the cell and sat him on the bed, and that Oliver continued to make the threat and kicked Stanton in his left leg. (Id.).

The disciplinary hearing records reflect that Oliver testified that the officers came into his cell to conduct a search, that they grabbed him by the neck, choked him, and pushed him against the wall, and that several officer took him back in the cell and threatened him, beat him, and choked him repeatedly. (Id.). Oliver denied threatening the officers and testified that he was in handcuffs, that he felt like he was provoked, and that he defended himself. (Id., at 45-52). Oliver submitted written questions before the hearing, and a final written statement to the hearing officer in which he asserted as follows:

> Hearing Officer, Mr. Michael Darnell Oliver-
> convict #207467 received a blackened Left
> eye and bruise neck (Left side) which you
> can physically see!  He also received other
> bruises and swellings (sic) on his body
> including also a busted lip and a Loosen
> teeth which was documented by medical care
> professional the day of the incident! Mr.
> Oliver was also secured in handcuffs which
> were pinned on behind Mr. Oliver's back when
> this incident occurred!  Mr. Oliver did not
> threatned (sic) or kick C.O. Earnest Stanton
> in the Left Leg! Instead, C.O. Earnest
> Stanton provoked a physical altercation with
> Mr. Oliver during a procedural cell search
> and beat this convict with several other
> officers to show off their badge and misuse
> the little authority he has and the officers
> as a d.o.c. official!

(Id., at 52).  In addition to himself, Oliver offered testimony from two other inmates, namely John White and James Maples. Inmate White testified that officer Stanton and Oliver were outside the cell, that Oliver was yelling, that Stanton directed Oliver to face the wall and be quiet, that Oliver kept hollering, that Stanton held Oliver to the wall and told him to calm down, and that Stanton took Oliver back into the cell. (Id., at 49). Inmate Maples testified that he occupied the cell (L-26) directly across from Oliver's cell, that he looked out his window and saw Stanton grab Oliver's neck and push him against the wall, and that they then took Oliver into the cell and beat him up. (Id.).  Maples testified that he was able to see over officer Broadhead's shoulder.  The hearing officer found neither

Oliver nor Maples to be credible witnesses, and found Oliver guilty of making threats to officers and assaulting Stanton. (Id., at 47). The hearing officers' recommendation that Oliver be found guilty of both offenses was adopted. (Id.).

As noted *supra*, to establish his excessive force claim, Oliver must prove both an objective and subjective component. Objectively, Oliver must show that the officers' alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation and that they "'act[ed] with a sufficiently culpable state of mind,'" *i.e.*, that the defendants acted "maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7. He must also establish that the "force was applied . . . maliciously and sadistically to cause harm[,] as opposed to being applied "in a good-faith effort to maintain or restore discipline[.]" Id.

With respect to the November 12, 2011 incident, there is no dispute that the incident arose in connection with a legitimate search being conducted in the Segregation Unit. However, Oliver denied both threatening the officers and kicking Stanton in his written statement to the hearing officer and during his testimony during the hearing, and he has steadfastly maintained that he did not do anything to provoke the officers and cause them to repeatedly beat him while handcuffed. Further, he

relies on the testimony of a fellow inmate, and he points to his medical records, which document that he sustained injuries in close proximity to the November 12th encounter. While Defendants dispute Oliver's version of the facts, Oliver has created an issue of fact as to whether he was compliant with Defendants' instructions so as to render Defendants' alleged actions in beating him while handcuffed without any discernable penological justification.

Also in dispute is the severity of the injuries suffered by Oliver as a result of the November 12th encounter. Defendants argue that Oliver's injuries were *de minimis*, indicating that only a *de minimis* amount of force was used. However, Oliver contends that he was repeatedly kicked and beaten by the officers and that as a result of said beating, he suffered "two (2) black eyes, cuts, bruises, and swellings (sic) all in different parts of [his] body" and a fractured rib cage (Doc. 28 at 7). Additionally, he contends that he received "two puffs" for his asthma attack and a brand new inhaler." (Id., at 7-8).

Based on the parties conflicting allegations, and the objective medical evidence in this case, the undersigned finds that although a close call, viewing the evidence in the light most favorable to Oliver, he has created a genuine issue of whether his claims involve more than a *de minimis* or

insignificant use of force. Hudson, 503 U.S. at 10 (supreme court held that the plaintiff's injuries which included bruises, swelling, loosened teeth, and a cracked dental plate were not *de minimis* for Eighth Amendment purposes); Hasemeier v. Shepard, 252 Fed. App'x 282, 284-85 (11th Cir. 2007); (evidence of injury including unconsciousness, cuts, bruises and broken dental bridge resulting from alleged beating was sufficient to create a genuine issue of material fact as to whether officers applied excessive force); see also Higgins v. Johnson, 2006 U.S. Dist. LEXIS 101474 (N.D. Fla. Nov. 7, 2006) (court held that where the plaintiff alleged that the defendants repeatedly kicked and beat him after he had been disarmed and was on the ground no longer resisting arrest, and the medical records reflected that the plaintiff's face was swollen such that it resembled a balloon, he suffered a black eye, a chipped tooth, an injury to his right knee and various abrasions, a reasonable jury could conclude that the plaintiff's claims constitute more than a "*de minimis*" or insignificant use of force).

In reaching this conclusion, the undersigned is cognizant of the fact that when Oliver was initially examined almost immediately after the November 12th incident, a busted lip was the only injury noted. However, the next day, Oliver requested medical treatment, and on November 14th, more extensive injuries

were noted, *i.e.*, black left eye, loose tooth, and abrasions on the left thigh. Interestingly, these injuries are all to Oliver's left side and appear to be completely consistent with Defendants' contention that Oliver kicked Stanton, and in response, he grabbed Oliver's left hand, and as they proceeded to take Oliver down, Oliver hit his head on the bed.

Moreover, the record evidence reflects that months before this incident, Oliver, in June 2011, sought dental care and alleged that the "tooth in front of [his] mouth [was] broken by police". Oliver requested a dental cleaning and repair for "[his] 2 teeth". (Doc. 48-14 at 21). The record reflects that Oliver received a filing for his tooth #9 on July 14, 2011, prior to the incident in question, and he had tooth #7 extracted a few weeks after the November incident. (Doc. 48-14 at 19, 20, 23). This evidence certainly suggests that Oliver's tooth #7 was likely in a defective condition prior to the November testimony. Finally, to the extent Oliver now claims to have suffered a bruised or cracked right rib, there is nothing in the medical records that reflect that Oliver ever reported any

problems with his ribs to the medical staff at Holman[13]. That said, upon consideration of the record evidence, the Court concludes that based on Oliver's version of the November 2011 incident and the objective medical evidence, Oliver has created a genuine issue with respect to whether Defendants Kimbrel, Broadhead, Stanton, Gipson, Tyus, and Andrews used excessive force against him on November 12, 2011.

---

[13] In his complaint, Oliver asserts deliberate indifference, yet, he has not developed the claim. To the extent that Oliver is contending that Defendants were deliberately indifferent in not ordering an x-ray of his ribs while he was at Holman, that claim is due to be dismissed. A prison official violates the Eighth Amendment when he acts with deliberate indifference to an inmate's serious medical needs, giving rise to a cause of action under § 1983. See Estelle v. Gamble, 429 U.S. 97, 104-05, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). To prevail on a deliberate-indifference claim, a plaintiff must show that he had an objectively serious medical need and that the defendant acted with deliberate indifference to that need. See Burnette v. Taylor, 533 F.3d 1325, 1330 (11th Cir. 2008). To establish deliberate indifference, a plaintiff must show that the defendant had: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." Id. (citation and internal quotation marks omitted). No liability arises under the Constitution for an official's failure to alleviate a significant risk that he should have perceived but did not. See id., 533 F.3d at 1331 (citation and internal quotation marks omitted). In this case, Oliver has not alleged nor established that the named Defendants were responsible for his medical care, let alone for arranging for an x-ray. Plus, the medical records fail to demonstrate any problems with Oliver's ribs or any request by him, while confined at Holman, relating to his ribs. Accordingly, to the extent Oliver is seeking to make out a deliberate indifference claim, he has failed to do so.

## IV.  CONCLUSION

Based on the foregoing, it is recommended that Defendants' Motion for Summary Judgment (Doc. 73) be **GRANTED in part.** Specifically, it is recommended that Plaintiff's claims with respect to the incident occurring on July 10, 2011 and involving Defendants Shelton Forney, L. Bailey, K. Reynolds, R. Armstrong, Johnny L. Johnson, C. Kimbrel, and Thaddeus Betts be **DISMISSED** with prejudice and that Plaintiff's claims with respect to the incidents occurring on August 24-25, 2011, and involving Defendants Johnny L. Johnson, C. Kimbrel, J. Broadhead, Earnest Stanton, A. Gipson, C. Daughtry, Russell Johnson, and Carroll be likewise **DISMISSED** with prejudice.  It is further recommended that Defendants' motion for summary judgment on Plaintiff's excessive force claim arising out of the incident occurring on November 12, 2011 and involving Defendants Kimbrel, Tyus, Andrews, Broadhead, Stanton and Gipson be **DENIED**, and that an evidentiary hearing be scheduled to address that claim.

## Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72(b); S.D. ALA. L.R. 72.4. The parties should note that under Eleventh Circuit precedent, "the failure to object limits the scope of [] appellate review to plain error review of the magistrate judge's factual findings." Dupree v. Warden, Attorney General, State of Alabama, 715 F.3d 1295, 1300 (11th Cir. 2011). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **19th** day of **August, 2014.**

_____/s/ SONJA F. BIVINS_____
**UNITED STATES MAGISTRATE JUDGE**