IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MICHAEL DARNELL OLIVER,          *
(AIS #: 207467)                  *
    Plaintiff,               *
                             *
vs.                              *  CIVIL ACTION NO. 11-00520-KD-B
                             *
JOHNNY L. JOHNSON, *et al.*,     *
                             *
    Defendants.              *

## REPORT AND RECOMMENDATION

Michael Darnell Oliver, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. In an order entered on September 11, 2014, the Court entered summary judgment in favor of Defendants on all of Plaintiff's claims except his excessive force claim arising out of a prison incident that occurred on November 12, 2011. (Doc. 80). The undersigned Magistrate Judge conducted an evidentiary hearing on December 18, 2014 on Oliver's remaining claim for injunctive relief and monetary damages against Defendants Christopher Kimbrel, Kenneth Tyus, Charles Andrews, Joel Broadhead, Earnest Stanton and Anthony Gipson. After duly considering all relevant pleadings, hearing testimony, and exhibits, the undersigned concludes that judgment should be entered in favor of Defendants and against Plaintiff.

I.    **SUMMARY OF HEARING TESTIMONY**

    **A. MICHAEL OLIVER**

As evidentiary support for his claim, Plaintiff relied on

records from his medical file, his testimony and the testimony of inmate James Maples.   At the evidentiary hearing, Oliver testified that at approximately 3:00 a.m. on November 12, 2011, Defendants Broadhead, Stanton and Gipson came to his cell door, and instructed him to place his hands through the tray so he could be handcuffed for a cell search.   According to Oliver, he put on his pants and shoes and placed his hands through the tray.   He was handcuffed behind his back, the cell door was opened, and he walked out of the cell and began talking to a fellow inmate whose cell was also being searched.

Oliver testified that he and the other inmate were discussing all of the drama with the early morning search when Gipson approached and told them to shut the "fuck up."   Oliver responded that Gipson could not tell him to shut up and the two began exchanging words.   Broadhead and Stanton, who had been searching inside Oliver's cell, came out of the cell and pushed Oliver's head into the wall twice.   Oliver was then taken back into his cell and words were exchanged between him and the officers.   Oliver testified that Kimbrel, Andrews, and Tyus joined the other officers in his cell.

According to Oliver, rather than commence with a strip search per procedure, the officers were patting his pants and trying to snatch his pants off.   When Oliver questioned what they were doing, they threw him against the wall, and through the bunk bed (which did not have a mattress), and they all

started to beat him up.  Oliver testified that the officers were grabbing him by the throat and choking him, punching him in his face and ribs, and stomping him in his chest.  Oliver estimates that the beating lasted about ten minutes.

Oliver further testified that the officers took him out of his cell, and en route to the health unit, Broadhead and Gipson continued to punch and slap him, and threw him against a door causing a bump on his head. Oliver also testified that once in the health unit, the officers continued to rough him up and holler at him in front of the nurses.  Oliver further testified that en route from the health unit, the officers punched and stomped him on the elevator.

According to Oliver, he was seen in the health unit by a male nurse, and while he told the nurse about his arm being swollen, the nurse did not record anything Oliver told him. Oliver further testified that the male nurse did not give him an ice pack although he requested one, and that while in the medical unit, a female nurse completed a body chart, which was falsified.  He also testified that he did not swell immediately.

Oliver testified that he requested a follow-up medical visit, and during that medical visit, he was seen by a female nurse, Poindexter.  Oliver stated that the nurse tried to get more pictures made because his eyes were swollen, he had bruises, and a loose tooth, which he indicated had gingivitis in it.  Oliver told the nurse about pain in his ribs, and she

recommended that he see a doctor for fractured ribs.  Oliver testified that his tooth was later extracted, and that the doctor was suppose to order x-rays, but failed to do so.  According to Oliver, by the time he was transferred to the Donaldson facility, the doctor at Donaldson told him that he had fractured ribs, but that it was too late for a cast because his ribs had healed pretty good.

Oliver testified that he had heard that Kimbrel is a "Klansman," and that Tyus and the others are "white supremacists."  Oliver further testified that he believes that he was assaulted because of the color of his skin.

### B. JAMES MAPLES

Also testifying on Oliver's behalf was James Maples, an inmate who was housed across from Oliver on the day of the incident.  Maples testified that he was in cell L12 on the second level, which was directly across from Oliver's cell.  He also testified that although the cell door and walls are solid, he could look through a window in the front of his cell directly into Oliver's cell.  On direct examination, Maples testified that the officers were conducting a routine shakedown on their floor, and that Oliver was led out of his cell, with his hands cuffed behind his back, and told to stay against the wall while his cell was being searched.  Maples observed Stanton grab Oliver's neck and push him against the wall and Oliver jerked away twice.  They then took Oliver back into his cell and all of

the officers in the courtroom started stomping, kicking, and beating up Oliver.

On cross-examination, Maples testified that the whole incident lasted approximately two minutes, and that it is routine for officers to conduct cell searches and to remove an inmate from the cell while the search is being conducted. He acknowledged that at Oliver's disciplinary hearing, the only two officers he mentioned as being involved in the altercation were Stanton and Broadhead. Maples testified that he saw Kimbrel, Broadhead and Stanton push Oliver into the cell and kick and stomp him. He also testified that he saw the officers push Oliver straight to the floor, that he could see over Broadhead because Broadhead appeared to be kind of bent over like he was holding Oliver down, and that he did not see Oliver kick Stanton.

Maples testified that he observed Oliver, dressed in boxers, exit the cell accompanied by Kimbrel and Stanton. He surmised they were going to the health unit. Maples testified that Tyus and Broadhead returned Oliver to his cell and that he did not pay attention to any bruises that may have been on Oliver when he returned.

### C. CHRISTOPHER KIMBREL

Defendant Kimbrel testified that on the day of the incident he was a supervisor assigned to the segregation room at Holman. He testified that he went to Oliver's cell the night of the

incident, and that Oliver was neither kicked nor beaten. According to Kimbrel, following a routine cell search, Oliver turned and kicked Stanton, who then took Oliver to the floor. Kimbrel testified that while Stanton was taking Oliver to the floor, Oliver hit the bed, and his lip was bruised. Kimbrel further testified that Broadhead assisted Stanton in gaining control of Oliver so that he would stop resisting. According to Kimbrel, Oliver was then helped onto his feet and he and Gipson escorted Oliver to the health unit. At the health unit, Kimbrel took photographs of Oliver, and he prepared an incident report documenting the use of force by Stanton. (See Defendants' Joint Exs. 1, 2, 3, 6a-6c).

### D. EARNEST STANTON

Stanton testified that he is a correctional officer at Holman, and that on the night of the incident, he searched Oliver's cell as part of a routine cell search in the segregation unit. According to Stanton, he instructed Oliver to place his hands in the tray so that he could be handcuffed. Once handcuffed, Oliver was led out of the cell and Stanton and Broadhead went into the cell to began the search. Stanton testified that Oliver started to curse so he left the cell and directed Oliver to be quiet. Stanton further testified that Oliver was agitated and started moving around, and in response, he told Oliver to calm down. Stanton testified that he then placed his hand on Oliver's back and placed him against the

wall.

Next, Stanton testified that he directed Oliver to return to his cell because the search was completed, and that while in the cell, Oliver turned around and kicked him in his left leg. Stanton testified that at that point, he immediately grabbed Oliver under his left arm pit, did a take down and that Oliver ended up with the top part of his body on the bed, and his knees on the floor. Stanton also testified that Broadhead assisted him in gaining control of Oliver, and that Oliver was not kicked nor punched during the incident. Stanton further testified that Oliver was taken to the health unit with a busted lip following the incident. According to Stanton, Oliver was charged with two disciplinary infractions, namely making threats and assaulting an officer, and was found guilty following a disciplinary hearing. (See Defendants' Joint Ex. 4).

On cross examination, Stanton testified that following the cell search, when Oliver entered the cell, he patted Oliver's pockets. According to Stanton, patting Oliver's pockets was not the procedure for conducting a strip search and he never progressed to a strip search because Oliver turned and kicked him. Stanton also testified that as Oliver was taken down, his face/head hit the bed. Stanton testified that he did not see any officer inflict pain on Oliver and that he did not accompany Oliver to the health unit. Stanton further testified that he did not recall Defendant Andrews being in Oliver's cell during

the incident.

### E. JOEL BROADHEAD

Broadhead testified that on the day of the incident, he and Stanton searched Oliver's cell for contraband. He also testified that Oliver was being loud and aggressive and that a strip search of Oliver was never conducted because he turned and kicked Stanton. Broadhead testified that he observed Stanton then grab Oliver from the side and take him down towards the bed. According to Broadhead, he assisted Stanton in gaining control of Oliver by holding Oliver's legs down until he was no longer combative. They then stood Oliver up and escorted him out of the cell, where other officers took him to the health unit. Broadhead testified that Oliver had a busted lip and that he did not observe anyone punch or kick Oliver.

On cross examination, Broadhead testified that he squatted down to hold Oliver's legs in order to gain control of the situation. He also testified that he did not recall Gipson nor Andrews being in Oliver's cell. Broadhead further testified that that he believes that if an inmate is involved in an altercation, the procedure is to remove his pants for pictures in the health unit.

### F. ANTHONY GIPSON

Gipson testified that he was employed as a sergeant at Holman on the day of the incident. According to Gipson, he and Kimbrel were involved with another inmate when they heard Oliver

talking loudly outside of his cell.  By the time Gipson arrived at Oliver's cell, the incident was over and Oliver was being escorted to the health unit, so Gipson never entered Oliver's cell.  Gipson testified that they typically had three officers escorting Oliver because of his violent past and his behavior. According to Gipson, he remained with Oliver in the health unit and escorted him back to his cell.  He also testified that he did not observe anyone kick or punch Oliver and that he did not see Defendant Andrews that night.

### H. KENNETH TYUS

Tyus testified that he was employed as a sergeant at Holman on the day of the incident.  According to Tyus, he was involved in another cell search when he heard Oliver talking in a loud and aggressive voice and making derogatory comments directed at the officers.  Tyus testified that he left his area and headed towards Oliver's cell.  When Oliver was placed back in his cell after the shakedown, he turned and kicked Stanton as if he was trying to trip him up.  According to Tyus, Stanton took Oliver to the ground, and no additional force was used.  Tyus also testified that Oliver was taken to the health unit, with an abrasion on his lip.

On cross examination, Tyus testified that Oliver was in cell L25 and he and Andrews were two cells down in L27.  Tyus also testified that when Oliver became loud and said something indicating that he would fight the officers if he were not in

handcuffs, he left Andrews to finish up the search of L27 because he did not want things with Oliver to escalate. Tyus further testified that he never entered Oliver's cell, but observed from the Tier. According to Tyus, he cannot recall if he helped to escort Oliver to the health unit, but he was present when Oliver was escorted back to his cell.

### I. BENNY ANDREWS

Finally, Benny Andrews, a nurse employed by Corizon Health testified for Defendants. Nurse Andrews testified that Corizon provides health cares services at the Holman facility through a contract with the department of corrections. According to Nurse Andrews, he treated Oliver when he was brought to the health unit on November 12, 2011, and he prepared the body chart dated November 12, 2011. (Defendants' Joint Ex. 5). Nurse Andrews said all Oliver told him about his injury was that "they busted my lip." On examination, Nurse Andrews observed a minor abrasion to Oliver's lower lips. Nurse Andrews also noted that Oliver was fully oriented, that his skin was warm and dry, and that he was in no acute distress. Nurse Andrews testified that he examined Oliver for bruises, but did not see any except for the abrasion on Oliver's lip. Thus, Nurse Andrews did not proscribe any treatment but directed Oliver to return if he was in distress.

On cross examination, Nurse Andrews reiterated that he examined Oliver on November 12, that he did not see anything

aside from the bruised lip, and that Oliver did not bring anything else to his attention. He also testified that Oliver kept his head lowered while talking to him and that might be why he did not observe Oliver's loose tooth. Nurse Andrews reviewed pictures taken of Oliver on November 12, 2011 and testified that the pictures reflected shadows as opposed to any bruises on Oliver's body. According to Nurse Andrews, no bruises, except from the bruised lip, were present when he examined Oliver; however, he explained that bruises go through healing stages, and that while a bruise may initially start out as red, it can later turn to purple or dark black as time passes.

Nurse Andrews also testified that it is not uncommon for the inmates to enter the health unit wearing boxers so that a complete exam can be conducted. He further testified that a body chart is completed whenever requested by the department of corrections.

Nurse Andrews identified Plaintiff's Ex. No. 7 as a nursing assessment sheet with a sick call request by Oliver. According to Andrews, the document reflects that Oliver made the sick call request on November 13, 2011, and was seen by the nurse the next day. On the sick call request, Oliver reported that he had been assaulted, that he had a swollen and blacken eye, bruises on his back and body that needed treatment, allergy and a strength headache. He also reported that his head was still itching and that he had not received his shampoo, which was to have been

ordered a month ago.  Oliver also asserted that his legs and back were aching, that he had a loose tooth, and that he needed to see the dentist.

Nurse Andrews identified Plaintiff's Exs. 3 and 4 as assessments by Nurse Poindexter, who examined Oliver on November 14, 2011.  Nurse Poindexter's assessment included a black eye (at left eye), loose tooth, left neck abrasion, dry scalp, small raised bumps, no flakes noted, and left thigh discoloration blush.  The records also reflect Plaintiff was proscribed Motrin.

At the hearing, Oliver submitted a medical record that reflects that he had a tooth extracted on November 30, 2011, which was approximately two weeks following his altercation with officers. (Plaintiff's Ex. No. 2).  Oliver also submitted medical records dated May 12, 2012.  These records reflect that at Donaldson, Oliver reported pain in his side and asserted that it started on November 12, 2011 after he was assaulted by "ADOC," and that he was supposed to have X-rays of his ribs. (Plaintiff's Exs. Nos. 8, 9)  The records also reflect that the nurse found no evidence of Oliver's prior complaints of rib pain in his medical jacket.

## II.  DISCUSSION

### A. Relevant law

The Eighth Amendment's prohibition against cruel and unusual punishment, U.S. Const. amend. VIII, governs the use of

force by prison officials against convicted inmates. Campbell v. Sikes, 169 F.3d 1353, 1374 (llth Cir. 1999).   "[W]hether a prison guard's application of force is actionable turns on whether that force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purpose of causing harm." Bozeman v. Orum, 422 F.3d 1265, 1271 (llth Cir. 2005)(per curiam)(citation omitted). To determine whether an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for application of force, the relationship between the need and the amount of force used, the threat reasonably perceived by reasonable officials, and any efforts made to temper the severity of a forceful response." Hudson v. McMillian, 503 U.S. 1, 7-8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)(citations omitted); see also Whitley v. Albers, 475 U.S. 312, 320-21, 106 S. Ct. 1078, 1085, 89 L. Ed. 2d 251 (1986)

Notably, 'not . . . every malevolent touch by a prion guard gives rise to a federal cause of action." Hudson, 503 U.S. at 9. Rather, the use of force must be "gratuitous or disproportionate" and must have "no object but to inflict pain." Skritch v. Thornton, 280 F.3d 1295, 1304 (llth Cir. 2002).  "It is obduracy and wantonness, not inadvertence or error in good faith that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause. Whitley, 475 U.S. at 319.  "The

infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." Id. Further, an excessive force claim "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Hudson, 503 U.S. at 9-10(citation omitted).

However, a plaintiff is not required to show that the application of force resulted in serious injury. Id. at 8. Rather, the key inquiry under Hudson is whether the alleged conduct involved "unnecessary and wanton infliction of pain." Id. Whether a defendant's use of force is excessive, and thus violative of an inmate's right to be free from cruel and unusual punishment, "depends on whether the [defendant's] act 'shocks the conscience,' Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007), and it necessarily will if the force was applied . . . maliciously and sadistically for the very purpose of causing harm.'" Danley v. Allen, 540 F.3d 1298, 1307 (11th Cir. 2008). "This is not to say that the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." Hudson, 503 U.S. at 7. "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have

been thought necessary' in a particular situation." Id. (quoting Whitley, supra, at 321). The extent of injury may also provide some indication of the amount of force actually applied. Wilkens v. Gaddy, 599 U.S. 34, 37, 130 S.Ct. 1175, 175 L. Ed. 2d 995 (2010).

A.   **Evidentiary Analysis**

Based on a review of the evidence presented at the evidentiary hearing, and the case pleadings, the undersigned rejects Oliver's version of the November 12, 2011 incident for a number of reasons. First of all, Oliver's testimony conflicts greatly with the testimony of the Defendants, as well as his own witness. As noted supra, Oliver testified that on the date in question, Defendants brutally attacked him in his cell by repeatedly kicking, stomping, and punching him for ten minutes, and that they continued to beat him and ram his head into the wall en route to the health unit, and then again while returning to his cell. His witness, James Maples, first testified that he witnessed the six Defendants beating Oliver.[1] However, on cross-examination, Maples acknowledged that at Oliver's disciplinary hearing, Broadhead and Stanton were the only two officers he identified as being involved in the altercation with Oliver on November 12th. Maples also acknowledged he observed Oliver

---

[1] While Maples testified that the Defendants assaulted Oliver, his testimony was not credible because his hearing testimony conflicted with his testimony at the disciplinary hearing, and his direct testimony at the hearing was inconsistent with responses he provided during cross-examination.

twice pull away from Stanton despite being instructed by Stanton to face the wall and that he only observed three officers, namely Stanton, Broadhead, and Kimbrel enter Oliver's cell. Maples also admitted, on cross examination, that the altercation lasted all of two minutes, and that he saw Broadhead kneeling down as if he was trying to hold Oliver's leg.

Further, Defendants Stanton, Broadhead, Tyus, and Kimbrel all testified without contradiction that Stanton and Broadhead were the only two officers involved in the altercation with Oliver, that Oliver was taken to the floor after kicking Stanton, and that Oliver made contact with the bed while being taken to the floor. Defendants' version of the events is corroborated by the Use-of-Force investigation findings and the disciplinary hearings following the incidents. (See Defendants' Joint Exs. 1, 2, 3, 4).

Most importantly, the medical records following the incident do not support Oliver's version of the events. (See Defendants' Joint Exs. 5, 6a-c; Plaintiff's Exs. 2, 3, 4, 7, 8, 9). While Oliver contends that he was brutally assaulted by six (6) guards who repeatedly punched, kicked, and stomped him in all parts of his body, including his face, and who choked him and repeatedly banged his head against the wall, all for a least ten (10) minutes, the objective medical records from Oliver's medical assessment immediately following the incident fail to reveal any evidence of such a brutal attack. (Id.).  In fact,

16

Oliver's medical record from the health visit immediately following the incident reveals that Oliver only suffered a "minor abrasion to his lower lip". (Defendants' Joint Ex. 5). Indeed, other than his lip, no other abnormalities were noted on Oliver's body chart and the records reflect that his breathing was "easy," his speech was clear, and he was in no acute distress. (Id.). Furthermore, Oliver's own statement to the medical personnel discredits his version of the events as Oliver's only complaint to the medical staff immediately following the incident was "[t]hey busted my lip". (Id.).

While Oliver was seen in the medical unit two days later, and was noted to have one loose tooth, a left black eye, abrasions to the left side of his neck, and left thigh discoloration, these injuries are consistent with Defendants' contention that after Stanton placed his arm under Oliver's left armpit and took him down, the upper part of Oliver's body hit the bed while his legs came to rest on the floor. Given that Oliver's injuries were on the left side of his body, the medical findings are consistent with the Defendants' version of the altercation, and completely contradict Oliver's contention that he was brutally kicked, stomped, punched, choked, and his head was repeatedly banged against the wall for at least ten (10) minutes by six (6) prison officials. Indeed, those same records reflect that Oliver suffered no injury to his ears, nose, throat, jaw, lungs, head, abdomen, and right eye. (Id.).

17

Further, no injuries, bruising, or swelling were noted on Oliver's back, arms, head,[2] or his right arm. Furthermore, although Oliver contends that his right rib cage was fractured during the incident, the medical reports fail to document any existence of such injury and specifically note that Oliver's abdominal exam was completely normal. (Plaintiff's Ex. 3). These injuries, which are primarily to Oliver's left side and were not apparent immediately following the incident, fail to support Oliver's version of the facts that he was brutally beaten, stomped, kicked, punched, and choked, and his head was repeatedly banged against the wall by six (6) guards for over ten (10) minutes.

As this evidence, along with the overwhelming record evidence outlined supra, clearly contradicts and discredits Oliver's version of the events, the Court rejects Oliver's version of the facts to the extent that Oliver claims he was repeatedly punched, stomped, kicked, and choked, and that his head was rammed into the wall as a reasonable fact-finder could not believe Oliver's version of the facts. See Vicks v. Knight, 380 F. App'x 847, 852 (11th Cir. 2010); Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (U.S. 2007).

Based on the testimony and exhibits, the Court finds that: At approximately 3:00 a.m. on November 12, 2011, as Kimbrel,

---

[2] Records reflect that Oliver had small raised bumps on his head associated with his dry scalp. (Doc. 48-14 at 7).

Tyus, Broadhead, Stanton, Andrews, and Gipson were conducting shakedowns in the segregation unit, Oliver, who was handcuffed, twice jerked away from Stanton while his cell was being searched, and that upon escorting Oliver back into the cell, Oliver turned quickly and kicked Stanton as he attempted a pat down of Oliver.  In attempt to subdue Oliver and stop the assault, Stanton aggressively grabbed Oliver by his left arm, under his armpit, and forcefully pushed him down towards the bed, causing Oliver to hit his face and upper body on the bed and forcefully hit the ground on his left side.  Broadhead squatted down and held Oliver's feet and legs until he stopped resisting.  At this point, Oliver was stood up and escorted to the medical unit by Kimbrel and Gibson.  In the medical unit, Oliver complained "they busted my lip" and a minor abrasion to Oliver's lip was noted on his body chart.  Two days following the incident, Oliver was seen again in the health unit, and the nurse noted that he had bruises to his left side, including a swollen and black left eye, left neck bruises, left thigh bruises, and a loose tooth, resulting from Stanton's grabbing Oliver's left arm and forcefully pushing him towards the ground.

As outlined supra, the force at issue involving the November 12, 2011 incident was Stanton's grabbing of Oliver's arm and forcefully pushing Oliver towards the ground, causing Oliver to hit his head and upper body on the bed and sustain injuries to his left side, in attempt to subdue Oliver after

Oliver kicked him.  In order to establish an Eighth Amendment excessive force claim against Stanton regarding his forcefully pushing Oliver in order to stop Oliver's assault, Oliver must prove both an objective and subjective component.  That is, Oliver must show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation and that Stanton "'act[ed] with a sufficiently culpable state of mind,'" *i.e.*, that the defendant acted "maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7.

Subjectively, then, Oliver must establish that the "force was applied . . . maliciously and sadistically to cause harm[,] as opposed to being applied "in a good-faith effort to maintain or restore discipline[.]" Id.  In the instant case, there is simply insufficient evidence that would support a finding that Stanton used force "maliciously and sadistically" for the purpose of causing harm.  First, as found by the Use-of-Force investigation, there was need for application of some force in order to stop Oliver's assault on Stanton.

Indeed, James Maples, Oliver's own witness testified that immediately prior to the incident, he twice observed Oliver jerk away when Stanton instructed him to stop yelling and remain still while his cell was being searched.  Further, Gipson testified that due to Oliver's propensity for violence, they often arranged triple escorts when Oliver needed to be moved within the facility.  Under these circumstances, the court finds

20

that upon being kicked by Oliver, Stanton reasonably perceived the need for the application of force to restore discipline, and that the evidence is insufficient for a reasonable jury to find that the force used was unreasonable, malicious, or sadistic.

Second, the extent of Oliver's injuries do not support a reasonable finding that the force used was used maliciously and sadistically. See Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999). As noted, Oliver's injuries were by and large on the left side of his body, consistent with Defendants' testimony that Stanton took Oliver to the floor by placing his left hand under Oliver's armpit. In the immediate aftermath of the take down, only a minor lip abrasion was apparent. Within two days, a swollen and black left eye, left neck abrasions, and left thigh bruises were noted. However, the fact that Oliver was escorted to the health unit immediately after the incident for treatment also undermines Oliver's unsupported allegation that Stanton's conduct was malicious or sadistic inasmuch as the officers took steps to immediately ensure that Oliver received prompt treatment for his injuries. Further, while Oliver testified that he believes the assault was motivated by the color of his skin because he had heard that some of the Defendants were "Klansmen" or "white supremacists," the court takes note of the fact that like Oliver, Stanton is black, and that no one testified that the Defendants used any racial epithets or slurs during the incident in question.

Turning to the objective component, Oliver's documented injuries do not support a finding that Oliver was subjected to anything other than *de minimis* force, which is insufficient to establish a constitutional violation under the Eighth Amendment. Cf. Johnson v. Moody, 206 F. App'x 880, 882 (11th Cir. 2006) (summary judgment proper where plaintiff failed to show that alleged wrongdoing was objectively harmful enough to establish a constitutional violation; evidence showed guard slammed tray door on inmate's finger resulting in complaints of pain for six months and a cut for which inmate was given Motrin, a bandage, and a tetanus shot). Bearing in mind all of the factors enumerated above, the Court finds that the force used by Stanton against Oliver was substantial, but it was not excessive. Therefore, Oliver's Eighth Amendment excessive force claim fails as a matter of law.[3]

## III.   CONCLUSION

In sum, the credible evidence supports Defendants' defense. Having resolved in Defendants Broadhead, Stanton, Gipson, Kimbrel, Tyus and Andrews' favor the disputed account of their

---

[3] To the extent Oliver contends that his ribs were injured during the November 12th incident, and that he was denied medical care because no X-ray was taken of his ribs, this claim must fail. The objective medical records and Oliver's own medical requests immediately following the incident contradict his contention. Plus, there is nothing before the Court that suggests, let alone demonstrates, that Defendants were responsible for ordering an X-ray for Oliver. (Plaintiff's Exs. No. 4, 7, 9).

physical encounter with Oliver on November 12, 2011, the Court concludes that the record does not establish any constitutionally impermissible use of force and that Defendants are entitled to judgment as a matter of law.

Accordingly, the undersigned RECOMMENDS that judgment be entered in favor of Defendants Broadhead, Stanton, Gipson, Kimbrel, Tyus, and Andrews and that this case be dismissed with prejudice.

### Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. ALA. L.R. 72.4. The parties should note that under Eleventh Circuit precedent, "the failure to object limits the scope of [] appellate review to plain error review of the magistrate judge's factual findings." Dupree v. Warden, Attorney General, State of Alabama, 715 F.3d 1295, 1300 (11th Cir. 2011).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or

refers to the briefing before the Magistrate Judge is not specific.

     **DONE** this **3rd** day of **March, 2015.**

____**/s/ SONJA F. BIVINS**____
**UNITED STATES MAGISTRATE JUDGE**
